UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
UNITED STATES OF AMERICA      :
                             :
v.                            :    CRIM. NO. 3:16 CR 123 (AWT)
                             :
ASTI BUTLER                   :
                             :
-----------------------------x
```

## RULING ON MOTION TO SUPPRESS

Defendant Asti Butler ("Butler") is charged in a one-count indictment with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Butler has moved to suppress all evidence obtained from the entry into and search of 730 George Street, Apartment 307, New Haven on May 19, 2016, as well as all statements made by Butler on May 19, 2016.

For the reasons set forth below, the motion to suppress is being granted.

## I. FINDINGS OF FACT

On May 19, 2016, at approximately 6:36 a.m., eight officers on the United States Marshals Service Violent Crime Fugitive Task Force arrived at 730 George Street, New Haven. The Task Force, which is comprised in part of police officers from local police departments, is responsible for executing federal and state arrest warrants. The members of the task force at the scene that morning included New Haven Police Officer Ryan Przybylski ("Przybylski")

who was the lead officer, Hamden Detective Raymond Quinn ("Quinn"), Hartford Detective Zack Sherry ("Sherry"), and West Haven Police Officer Jason Aklin ("Aklin").

The Task Force was there to execute three arrest warrants for Butler. One warrant was in connection with an armed robbery in which another individual, not Butler, possessed a firearm. The other two warrants were in connection with domestic disputes. One involved Butler's ex-girlfriend, and the police report included a statement from the victim that she had previously seen Butler with a firearm. The second domestic dispute warrant involved Butler's significant other, Wilmeka Cogdell ("Cogdell"), and the incident had taken place in Cogdell's apartment. Cogdell had obtained a protective order, but Butler was not prohibited from being with her.

At approximately 6:39 a.m., several of the officers arrived outside third-floor apartment 307, which was the residence of Butler's significant other, Cogdell, and their six-month-old daughter. The task force officers were in full tactical gear with vests clearly identifying them as police officers, and they were armed with firearms. The officers knocked and announced their presence. At first there was no answer. As Officer Przybylski continued to knock, the officers heard voices inside the apartment, one male and one female. Around that time, the officers used a reverse peephole device to look inside the

apartment.  At approximately 6:42 a.m., Butler spoke to the officers, and they conversed with him through the door.  Butler informed them that he was coming out but that he wanted to brush his teeth first.  Butler's delay in opening the door, his prior involvement with firearms, and the fact that one of the warrants charged Butler with domestic violence against Cogdell, who was in the apartment, caused the officers to become concerned about their safety and the safety of others.  One officer left the hallway outside Apartment 307 to retrieve a battering ram from one of the police vehicles.  He returned with the battering ram, which ultimately was not used.

At approximately 6:51 a.m., Butler opened the door and presented himself in the doorway for arrest, hands first, as directed by the officers.  Butler was immediately pulled out of the apartment doorway and put onto the floor of the hallway, where he was handcuffed.  Cogdell was standing just inside the apartment, in full view of the officers, holding their daughter. As Butler was being put onto the floor and handcuffed, at 6:51 a.m., four of the officers entered Cogdell's apartment to conduct a protective sweep.  The officers told Cogdell to stay to the side and asked her whether anyone else was in the apartment.  She told them that no one else was there, and the officers had not heard any noises coming from the apartment other than the two voices, one male and one female.  The officers directed Cogdell to stand

in the kitchen, near the door to the apartment, while the officers

conducted a protective sweep of the apartment.  She had not

invited them in, nor had they sought permission to enter.  Cogdell

understood, though, that the officers were searching the apartment

"because they wanted to make sure no one else was in the

apartment."  Hr'g Tr. 173:5-6.  According to the officers, it took

four officers approximately five minutes to do a protective sweep

of the small apartment, which consists of one bedroom, one

bathroom, and an open kitchen and living room area.  The officers

conducted the protective sweep because they were going to be on

the scene for a short period after arresting Butler, to clear the

scene.  Officer Przybylski testified: "When we arrested him in the

hallway, we always expect to be on the scene just for safety

purposes . . . . It always takes a length of time after you effect

an arrest to clear the scene."  Hr'g Tr. 58:9 - 58:20.  The

officers believed that it is standard police procedure to enter an

apartment for the purpose of conducting a protective sweep when a

person is arrested outside that apartment.  Officer Aklin

testified:

   Q. And you testified that's just police procedure?
   A. Yes.
   Q. When someone is arrested outside the apartment, you
      enter the apartment?
   A. Uh-huh.
   Q. A matter of routine?
   A. Yes.
   Q. Don't even need to think about it?
   A. Yes.
   Q. So then you conducted a protective sweep?

A.  Correct.

Hr'g Tr. 156:24 – 157:9 (Aklin).

When the officers finished the protective sweep, Cogdell thought they were going to leave the apartment.  However, they did not.

Meanwhile, at approximately 6:52 a.m., other officers led Butler to an elevator and out of the building.  They put Butler into the back of a police vehicle.  Upon concluding the protective sweep, Detective Quinn went downstairs to interrogate Butler, who was still in handcuffs and sitting in the back of the police vehicle.  Butler was clearly in custody.  Quinn initiated the conversation, but at no point did Quinn give Butler a Miranda warning.  Quinn told Butler that if the officers found anything in the apartment, they would charge Cogdell.  Butler then stated that there was a firearm in the apartment and told Quinn where to find it.  Quinn relayed the information to the officers who were in the apartment via phone or radio.

After the protective sweep was completed, Officer Przybylski remained inside the apartment to speak with Cogdell.  He testified that he elected to conduct the interview in the privacy of the apartment, as opposed to outside in the hallway.  Several other officers were also in the apartment, including Detective Sherry, who described himself as being "on standby," Hr'g Tr. [cite], and Officer Aklin.  Some officers came and went, but there were

consistently four or five officers, who were armed and in full tactical gear, in the apartment.

Przybylski asked Cogdell for her consent to search the apartment. Cogdell responded by asking whether the officers needed a warrant to do so. Przybylski told Cogdell they could obtain a warrant or she could consent to the search. Cogdell requested permission to call her mother, Robin Jones ("Jones"), and the officers granted permission. Between 6:57 a.m. and 7:11 a.m., Cogdell called her mother once, received two calls from her mother, called work three times and made two additional calls. These calls ranged in length from two seconds to 139 seconds. During Cogdell's first call with Jones, both Cogdell and Detective Sherry spoke with Jones.

After that call had ended, the officers in the apartment received notice from the officers who were outside with Butler that Butler had reported the presence of a firearm in the apartment and stated where in the apartment it was located. The witnesses' testimony differs as to whether Cogdell granted consent to search before or after the officers located the firearm, but Cogdell did sign a consent to search form at approximately 7:20 a.m.[1], and the officers did locate and seize a firearm that was in the pocket of a jacket found in the closet. Also, the officers

---

[1] While other times are taken from the hallway surveillance video, the time the consent to search form was signed is based on Officer Przybylski's watch, which he did not synchronize with the video.

told Cogdell that they would have to call the Department of Children and Families concerning her daughter, but the witnesses' testimony differs as to whether they told her this before or after Cogdell signed the consent form. It is not necessary for the court to resolve either of these issues in deciding the instant motion.

Later that day, at approximately 3:00 p.m., while Butler was still in police custody, he was questioned again -- this time at the police station. Before the second interrogation, which was videotaped, Butler was given a <u>Miranda</u> warning and signed a waiver form. The officer conducting the second interrogation had not been present that morning for the arrest or for the first interrogation. Initially, the primary focus was the robbery for which Butler had been arrested. Nearly 20 minutes into the interrogation, however, the officer changed topics and showed Butler a photograph of the firearm seized from Cogdell's apartment that morning. Butler recounted that he had told the officers that morning that the firearm was his after being told by the officers that if Butler did not make a statement and the officers found anything in the apartment, they would charge Cogdell. The officer continued asking Butler about the firearm and did not take any steps to ensure Butler knowingly and voluntarily waived his <u>Miranda</u> rights regarding statements related to the firearm made during the second interrogation.

## II.  ANALYSIS

### A.  The Firearm

It is undisputed that because Butler was an overnight guest in Cogdell's apartment, Butler had a cognizable privacy interest in the apartment and can challenge the validity of the search. See Minnesota v. Olson, 495 U.S. 91, 98-100 (1990) (holding overnight guests "are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises," and as such, "can claim the protection of the Fourth Amendment").

Butler argues that the firearm should be suppressed because it was seized in violation of his Fourth Amendment rights.  A warrantless search is "*per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1993) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  Because Butler had a privacy interest in the apartment, "the government has the burden of showing that the search was valid because it fell within one of the exceptions of the warrant requirement."  Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)).

"One such exception is that a warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent."  United

States v. Elliot, 50 F.3d 180, 185 (2d Cir. 1995) (citing United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988)).  But the consent to search must not be "fruit of the poisonous tree," as explained in Wong Sun v. United States, 371 U.S. 471, 488 (1963).  Here, the government contends that the officers found the firearm while performing a search only after obtaining a valid, voluntary consent from Cogdell.  However, Butler argues that any consent Cogdell gave was tainted by the officers' illegal entry and prolonged and continuous presence in the apartment, and also was not a knowing and voluntary consent.[2]  Taint and voluntariness are distinct inquiries.  See United States v. Snype, 441 F.3d 119, 132 (2d Cir. 2006).  After analyzing the legality of the protective sweep and the officers' continuing presence in the apartment, the court concludes that these acts tainted Cogdell's consent.  Because the court finds that her consent was tainted, it does not reach the voluntariness inquiry.

### 1.  *The Protective Sweep*

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  Maryland v. Buie, 494 U.S. 325, 327 (1990).  Buie established that incident to an in-home

---

[2] Butler also argues that the officers lacked any consent to search, valid or otherwise, because Cogdell gave consent only after the officers had performed the search and discovered the firearm.  Because the court finds that Cogdell's consent was invalid because it was tainted, the court need not make a finding as to whether the officers obtained Cogdell's consent before or after they had found the firearm.

arrest, officers may permissibly, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. For officers to sweep beyond any immediately adjoining spaces, however, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. (citing the standards from Terry v. Ohio, 392 U.S. 1, 21 (1968), and Michigan v. Long, 463 U.S. 1032, 1049-50 (1983)).

"Different considerations come into play, however, when a defendant is arrested outside his residence and the government seeks to justify an entry into the home for a security check." United States v. Vasquez, 638 F.2d 507, 531 (2d Cir. 1980). "First, the arresting officer's need for protection from persons in the home will often be less compelling when the arrest takes place outside. Second, the government has an especially heavy burden in justifying a 'breach of the entrance to an individual's home.'" Id. (quoting Payton v. New York, 445 U.S. 573, 589 (1980)). Accordingly, a protective sweep inside a home incident to an arrest outside the home is permissible:

> if the arresting officers had "(1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence,

-10-

escape or jeopardize the safety of the officers or the
public."

Id. (quoting United States v. Agapito, 620 F.2d 324, 336 n.18 (2d
Cir. 1980)).  The Second Circuit reaffirmed this standard post-
Buie in United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990)
("Although we articulated this standard before Buie, we think it
may be read consistently with the Supreme Court's recent holding
concerning security sweeps.").

The government argues that "the officers had a reasonable
belief based on specific and articulable facts that the apartment
harbored an individual posing a danger to those at the arrest
scene[,]" and that under the "facts and circumstances, the
officers were entitled to conduct a protective sweep of the
apartment to ensure that there was nobody else present in the
apartment who could pose a risk of danger to the officers or Ms.
Cogdell as they concluded the arrest of Butler at the hallway
door."  Gov. Resp. 12 (Doc. No. 49).

The facts and circumstances were as follows: (i) 12 minutes
elapsed between the time the officers first began to knock on the
door and the time Butler opened the door and presented himself for
arrest in the apartment doorway; (ii) during that time, the
officers heard two voices in the apartment, one male and one
female; (iii) Butler had put off coming to the door and
surrendering, at one point stating that he had to brush his teeth;
(iv) the officers knew that Butler was wanted in connection with a

robbery during which a gun had been used by another participant; (v) Butler had a prior conviction for armed robbery; and (vi) a former girlfriend of Butler's, who had filed domestic violence charges against Butler, had told the police that she had seen Butler with a firearm and was afraid of him.

The court agrees that the officers had a reasonable belief based on specific and articulable facts that the apartment harbored an individual who might jeopardize the safety of those at the scene of the arrest, but the only such individual was Butler, and once he was taken into custody, that risk had been eliminated. To the extent there could have been any concern about a risk associated with Cogdell, that risk was eliminated at the time Butler was taken into custody because Cogdell was standing just inside the apartment in full view of the officers, holding her daughter. Thus, there was no need to conduct a protective sweep in order to eliminate any risk of danger posed by Cogdell, and in fact, the officers do not contend that they had a concern about Cogdell.

Moreover, the court can discern no basis for a reasonable belief by the officers that a third person, other than Cogdell and her daughter, was in the apartment. The officers knew that Butler was in the apartment because he was spending the night with Cogdell and their daughter. The officers heard two voices in the apartment, one male and one female. Use of the reverse peephole

device did not yield any information suggesting that there was any additional person in the apartment.  While the passage of the 12 minutes and Butler's stalling -- in combination with Butler's having a prior conviction for armed robbery, being wanted for a robbery in which a gun was used and having been seen with a firearm by an ex-girlfriend -- was cause for concern about Butler, nothing about the situation provided a basis for concern about someone other than Cogdell and her daughter being in the apartment.  Also, while the domestic violence charge against Butler was cause for concern that Cogdell might be at risk, nothing about that charge suggested in any way that there might be someone in the apartment other than Cogdell and her daughter. Furthermore, any concern for Cogdell's safety was eliminated once Butler was in custody in the hallway and Cogdell was in full view of the officers.  While the officers may have felt that there was a risk that some unidentified person in the apartment could come to Butler's aid as they completed the arrest in the hallway, that is not the standard.  Rather, the standard is that the officers have a reasonable belief that a third person is in the apartment and a reasonable belief that any such third person might jeopardize the safety of the officers or the public.  Here, there was no basis for a reasonable belief that any person other than Cogdell and her daughter were inside the apartment, much less that some such other person posed a safety risk.  Thus, the officers'

-13-

conduct in conducting the protective sweep did not fall within an exception to the warrant requirement.

Moreover, once the protective sweep was completed, officers remained in the apartment.  Officer Przybylski, when asked about what was transpiring at 7:14 a.m. could not be sure whether Cogdell had consented to a search prior to that time, and the government has the burden of proof.  In any event, the time on the written consent to search form is 7:20 a.m..  Thus the court concludes that the officers were in the apartment for somewhere between 23 and 29 minutes after first entering, and for at least somewhere between 18 and 24 minutes after the protective sweep was completed, before Cogdell consented to the search.

A lawful protective sweep "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  Maryland v. Buie, 494 U.S. 325, 335-36 (1990).  "Once police eliminate the dangers that justify a security sweep -- safety of police, destruction of evidence, escape of criminals -- they must, barring other exigencies, leave the residence."  United States v. Oguns, 921 F.2d 442, 447 (1990).  The government does not contend that there existed exigencies that would have justified the officers remaining in the apartment, and the court finds none.

Accordingly, even if the protective sweep had been permissible under the circumstances, the officers exceeded their legal authority by remaining in the apartment beyond the time necessary to conduct a protective sweep. "Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes." Oguns, 921 F.2d at 447. The officers' continued presence after the conclusion of the protective sweep constituted another, distinct Fourth Amendment violation.

### 2. *The Taint of the Officers' Illegal Entry and Presence Had Not Dissipated Prior to the Consent*

The government argues that Cogdell gave a valid, voluntary consent to search, and that any taint from an impermissible protective sweep had dissipated before the officers obtained Cogdell's consent. "Under Wong Sun, the agents' illegal entry invalidates [Cogdell's] consent unless 'the taint of the initial entry had been dissipated before the "consents" to search were given.'" Oguns, 921 F.2d at 447 (quoting Vasquez, 638 F.2d at 527; citing Wong Sun, 371 U.S. 471 (1963)). "The government bears the burden of proving that the taint has been alleviated. The government must show that the consent 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" Id. (citations and quotation marks omitted) (quoting Brown v. Illinois, 422 U.S. 590, 599, 604 (1975)).

"In assessing whether the taint of the illegal entry was sufficiently diminished," courts consider four factors: (1) "whether a Miranda warning was given," (2) "the 'temporal proximity' of the illegal entry and the alleged consent," (3) "the presence of intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." Oguns, 921 F.2d at 447 (quoting Brown, 422 U.S. at 603-04).

Here, the first factor "is not particularly pertinent" because although Cogdell was not given a Miranda warning, she was not herself under arrest. United States v. Valentine, 591 F. Supp. 2d 238, 245 (E.D.N.Y. 2008). The second factor, temporal proximity of the illegal entry to the alleged consent, however, weighs in favor of Butler here. Approximately 23 to 29 minutes elapsed between the time the officers entered the apartment to perform the protective sweep and the time the consent form was signed. Viewed in isolation, such a period of time might not be sufficient for the taint from an illegal entry to dissipate. But here the improper continued presence of the officers beyond the time needed to conduct the protective sweep was ongoing at the time Cogdell gave consent. Thus, here this factor weighs heavily against a finding that the taint had dissipated.

The third factor, which is the presence of intervening circumstances, also weighs heavily against a finding that the taint had dissipated. Not only did the officers remain in the

apartment beyond the time needed to complete the protective sweep, but the specific circumstances of the presence did not serve to diminish the taint of an illegal entry, and possibly increased it. There were four to five officers in full tactical gear in Cogdell's small, one-bedroom apartment "in the kitchen and living room area," as Przybylski interviewed Cogdell in the kitchen. Hr'g Tr. 21:17-18 (Przybylski). These additional officers "were kind of on standby" as "extra bodies." Hr'g Tr. 141:10, 142:23 (Sherry); see also Hr'g Tr. 155:1 (Aklin) ("I was just there."). The video shows officers entering and exiting the apartment at will, without knocking. Although the officers were moving about freely, it appears that Cogdell was not completely free to act as she wished. During the sweep, Cogdell was told "where to stand and what to do." Hr'g Tr. 56:15-16 (Przybylski). Then, "[o]nce [the protective sweep] was done and we felt it was safe, then we all sat -- we didn't all [sit] down -- we sat her down at the kitchen table." Hr'g Tr. 157:25–158:2 (Aklin). Although Cogdell was not handcuffed, and the officers' weapons were holstered and Cogdell responded in the affirmative when asked whether she was "allowed to move around the apartment," Hr'g Tr. 186:1-5 (Cogdell), Cogdell felt the need to ask whether she could call her mother, and even the officers characterized Cogdell as having been given permission to use her phone, see Hr'g Tr. 141:20 (Sherry) ("She was allowed to use the phone."). This was all in the

context of the officers remaining in her apartment when Cogdell
thought they were going to leave once they completed the
protective sweep.  Although the government points out that Cogdell
never asked the officers to leave, it is more likely that she
failed to do so because the circumstances were intimidating, and
not because she viewed the officers as being guests in her
apartment.

Nothing about these intervening circumstances helped diminish
the taint of the officers' illegal entry and continued presence.

The government urges the court to find that any taint had
diminished, citing to Snype and Oguns for support, but the facts
in each of those cases are distinguishable from the facts here.
In Snype, although "[o]nly twenty minutes elapsed between entry
into [the] apartment and [the] consent to search[,]" the
intervening circumstances included the SWAT team leaving the
apartment, the resident's "own liberty was restored, and she was
allowed to call her sister . . . ."  441 F.3d at 135.  "Together,
these intervening events effectively replaced the fearful
atmosphere of the initial forcible entry with relative calm."  Id.
Although Cogdell was allowed to make a call, like the resident in
Snype, in Snype, the resident's call was made in private, while
Cogdell's calls were made in the presence of the officers, and one
of the officers even participated in one of the calls with
Cogdell's mother.  While the resident in Snype perceived the entry

-18-

"as having occurred 'way, way before' her consent to search," id.,
Cogdell testified that "everything just happened so fast," Hr'g
Tr. 188:11 (Cogdell).  Also, while the resident in Snype testified
that she "knew that she was not required to consent to any
search," Snype, 441 F.3d at 135, Cogdell's testimony reflected
that she felt withholding consent would be futile, see Hr'g Tr.
177:4-14 ("I signed the paper because I figured they already found
the gun, they had what they wanted, so I signed the paper.").

In Oguns, the court found that the defendant was read his
Miranda rights, and the intervening circumstances included the
officers reading the consent to search form to the defendant and
the defendant rereading the form himself before signing it; the
court found that the agents had effectively advised Oguns of his
Fourth Amendment rights.  See Oguns, 921 F.2d at 447-48.  Here the
message conveyed to Cogdell was that if she exercised her right
not to consent to a search, the officer would simply obtain a
warrant.

The final factor in assessing whether the taint of the
illegal entry had sufficiently dissipated by the time Cogdell gave
consent is "the purpose and flagrancy of the official misconduct."
Id. at 447.  Here, the officers' actions were not "taken in bad
faith" or "fraught with evil purpose," terms used by the court in
Oguns in analyzing this factor.  Id. at 448.  Rather, the record
reflects that the officers believed their entry into and continued

presence in Cogdell's home was permissible as a matter of routine

police procedure.  Thus, the court concludes that this factor

weighs in favor of a finding that the taint of the illegal entry

had dissipated.

To summarize, the first factor is not particularly relevant

here, the second and third factors each weigh heavily against a

finding that the taint of the illegal entry had dissipated at the

time Cogdell gave consent, and the fourth factor weighs in favor

of a finding that the taint had dissipated.  Under the facts and

circumstances present here, the court finds that the taint of the

officers' illegal entry had not dissipated at the time Cogdell

gave consent, so her consent was not valid.  Accordingly, the

court concludes that all evidence obtained from the entry into and

search of Cogdell's apartment must be suppressed.  See United

States v. Vasquez, 638 F.2d 507, 527 (2d Cir. 1980) (holding that

following an illegal entry, "suppression is required of any items

seized during the search of the house, unless the taint of the

initial entry had been dissipated before the 'consents' to search

were given").

**B.    Butler's Post-Arrest Statement to Quinn**

The general rule regarding the use of statements of arrestees

is well-established:

> It is well settled that *Miranda* requires all individuals
> who are under arrest, or otherwise in police custody, to
> be informed prior to interrogation, *inter alia*, of their
> right to remain silent and to have an attorney present

during questioning. . . . If a suspect is not provided
with *Miranda* warnings, "the prosecution is barred from
using statements obtained during the interrogation to
establish its case in chief."

Georgison v. Donelli, 588 F.3d 145, 155 (2d Cir. 2009) (citations

omitted) (quoting United States v. Newton, 369 F.3d 659, 668 (2d

Cir. 2004)).  The exception to this general rule is that "the need

for answers to questions in a situation posing a threat to the

public safety outweighs the need for the prophylactic rule

protecting the Fifth Amendment's privilege against self-

incrimination."  New York v. Quarles, 467 U.S. 469, 657 (1984).

The Second Circuit has "distill[ed] to three principles" the

public safety exception.  United States v. Estrada, 430 F.3d 606,

612 (2d Cir. 2005).  First, the questions must be "related to an

*objectively* reasonable need to protect the police or the public

from any immediate danger."  United States v. Newton, 369 F.3d

659, 677 (2d Cir. 2004) (quoting Quarles, 467 U.S. at 659 n.8).

Second, "the exception is limited by the fact that pre-Miranda

questions, while 'framed spontaneously in dangerous situations,'

may not be investigatory in nature or 'designed solely to elicit

testimonial evidence from a suspect."  Estrada, 430 F.3d at 612

(citations omitted) (quoting first Newton, 369 F.3d at 678 and

then Quarles, 467 U.S. at 658-59).  Third, the Second Circuit

"expressly ha[s] not condoned the pre-Miranda questioning of

suspects as a routine matter," but rather treats "the public

safety exception as 'a function of the facts of cases so various

that no template is likely to produce sounder results than examining the totality of the circumstances in a given case.'" Estrada, 430 F.3d at 612 (quoting United States v. Reyes, 353 F.3d 148, 152 (2d Cir. 2003) (quoting United States v. Banks, 540 U.S. 31, 36 (2003) (internal quotation marks omitted)).

Here, the totality of the circumstances shows that the questions were not "related to an objectively reasonable need to protect the police or the public from any immediate danger." Newton, 369 F.3d at 677. Quinn had no objectively reasonable basis to believe that Butler had left behind a weapon in Cogdell's apartment that could pose a threat to public safety. The government argues that the presence of Butler's small, partially mobile child in the apartment gives rise to the public safety exception, but nothing about the circumstances here gives rise to an objectively reasonable belief that a firearm was left in the apartment within reach of the child.

The government points to Butler's criminal record, including the arrest warrants the officers were executing that day. One warrant was for armed robbery and involved an incident in which another individual, not Butler, brandished a firearm. Another warrant was for a domestic dispute after which Butler's ex-girlfriend reported having previously seen Butler with a firearm. Assuming arguendo that these comments were the basis for an objectively reasonable belief that Butler had brought a firearm

-22-

with him to Cogdell's residence, they nonetheless are not a basis for an objectively reasonable belief by the officers that such a firearm, taken by Butler to Cogdell's home, would be accessible and within reach of the small child.

The government also points to the delay between the time the officers arrived at the apartment door and the time Butler finally presented himself for arrest. This delay was certainly the basis for a concern about safety, as the officers did not know what may have been happening behind the closed door, but once Butler presented himself and was arrested and the officers had entered the apartment and performed a protective sweep, albeit impermissibly, the basis for a concern about safety had been eliminated.

The facts of this case are very different from those in United States v. Simmons, a case cited by the government in which the public safety exception did apply. 661 F.3d 151 (2d Cir. 2011). In Simmons, the officers were responding to a call from Simmons' roommate reporting that Simmons had displayed a firearm during a dispute the two had had days earlier, and the roommate requested that the officers escort the roommate into the apartment to retrieve his belongings. See id. at 153. When the officers encountered Simmons inside the apartment, they asked him about the presence and location of the firearm. See id. at 154. Thus reports about Simmons displaying a firearm were spatially and

temporally related to the time and place in which the officers questioned him.  Moreover, the incident involved the roommate who was then present, and the police questioned Simmons about the firearm while inside the apartment where Simmons and the roommate lived.

Here, unlike the circumstances in Simmons, the totality of the circumstances did not create an objectively reasonable need to protect the police or the public.  Rather, the questioning appears to have been "designed solely to elicit testimonial evidence from a suspect."  Quarles, 467 U.S. at 658-59.  Accordingly, Butler's post-arrest statement to Quinn must be suppressed.

C.   Butler's Statements at the Stationhouse

When a suspect is twice interrogated, once before being given a Miranda warning and once after, courts "must address whether the officers employed a 'deliberate, two-step strategy, predicated upon violating Miranda during an extended interview,' and if so, whether 'specific, curative steps' were taken to obviate the violation that occurred."  United States v. Capers, 627 F.3d 470, 477 (2d Cir. 2010) (citations omitted) (quoting Missouri v. Seibert, 542 U.S. 600, 621 (2010) (Kennedy, J., concurring)).  In determining whether the "officers' actions are sufficiently indicative of a deliberate circumvention of Miranda to require that a defendant's statements must be suppressed," courts are to "review the totality of the objective and subjective evidence

surrounding the interrogations in order to determine
deliberateness, with a recognition that in most instances the
inquiry will rely heavily, if not entirely, upon objective
evidence." Id. at 478-79. "[T]he burden rests on the prosecution
to disprove deliberateness," and "the government must meet its
burden of disproving the deliberate use of a two-step
interrogation technique by a preponderance of the evidence." Id.
at 479, 480.

The government points out that Butler gave the first
statement in the police vehicle and the second one at the
stationhouse, that different officers conducted the
interrogations, and that the primary focus of the stationhouse
interrogation was the alleged robbery. However, the court must
consider "the totality of the objective and subjective evidence
surrounding the interrogations."

Butler was twice subjected to custodial interrogation, once
several minutes after having been arrested, while handcuffed and
sitting in the back of the police vehicle, and then several hours
later at the police station. With respect to the first
interrogation, Quinn testified that at the time he initiated the
interrogation of Butler in the back of the police vehicle, he did
not perceive Butler to be a threat, the officers did not perceive
Cogdell to be a threat, and the protective sweep had determined no
one else was in the apartment. He testified that "the situation

was fairly calm" by that point, and "[he] could have Mirandized Mr. Butler had [he] chosen to do so[.]" Hr'g Tr. 121:15-19 (Quinn).  Instead, Quinn chose not to give Butler a <u>Miranda</u> warning, and told him "Hey, listen, man. You got your kid up there, your girl's up there. This isn't a good thing. If they find something there there's a good chance she may be charged with it." Hr'g Tr. 93:13-16 (Quinn).  Quinn testified that Cogdell was not, to his knowledge, a convicted felon, and acknowledged that Cogdell could have legally owned a gun.  The circumstances suggest that Quinn hoped Butler would react to Quinn's prompting by confessing about the presence and location of the firearm in order to protect Cogdell, and Butler did just that.

A different officer conducted the interrogation at the stationhouse.  That officer read Butler the <u>Miranda</u> warning, and Butler signed a form waiving his rights.  During the first 20 minutes or so the officer focused on the robbery that gave rise to the armed robbery arrest warrant.  The interrogating officer then abruptly changed the topic, though, pulled out and placed in front of Butler a photograph of the firearm seized from Cogdell's apartment that morning, and saying, "The other issue is that." Butler responded by confirming it was a photograph of the firearm the other officers had found that morning.  Butler went on to tell the interrogating officer that he had been told that if he did not confess to the presence and location of the firearm, the arresting

officers would arrest or charge Cogdell.  It appears that the
officer interrogating Butler at the stationhouse was already aware
of the circumstances under which Butler gave his first statement.
In any event, Butler told the second interrogator about the
circumstances surrounding Butler's prior statement, and the
officer continued the interrogation without taking any "specific,
curative steps" to obviate the prior violation.  See Capers, 627
F.3d at 477.

    After reviewing the totality of the circumstances surrounding
both interrogations, the court concludes that the government has
not met its burden of proving this two-step interrogation was not
a deliberate circumvention of Miranda.  It has not produced
evidence sufficient to outweigh the following evidence and the
reasonable inferences that can be drawn from it:  the fact that
the situation was calm when Quinn elicited Butler's initial
statement and the threat of charging or arresting Cogdell appears
to have been intentionally misleading; the fact that Quinn
concedes he could have given Butler the Miranda warning but chose
not to do so; the fact that the officer who conducted the
interrogation at the stationhouse appears to have already been
familiar with the circumstances under which Butler gave his first
statement; and the fact that during the interrogation at the
stationhouse before the officer asked Butler any questions about
the firearm, he placed a photograph of it in front of Butler and

an ordinary person would feel that invoking his Fifth Amendment rights at that point would be futile.

Therefore, Butler's statements at the stationhouse must be suppressed.

## III. CONCLUSION

For the reasons set forth above, the Motion to Suppress Evidence (Doc. No. 28) is hereby GRANTED.

It is so ordered.

Signed this 19th day of September, 2017, at Hartford, Connecticut.

_____
/s/AWT
Alvin W. Thompson
United States District Judge
